Argued and submitted September 12, decision of Court of Appeals affirmed, order of Workers' Compensation Board reversed, and case remanded to Workers' Compensation Board for further proceedings December 14, 2006

In the Matter of the Compensation of
John P. Tye, Claimant.

John P. TYE,
*Respondent on Review,*

*v.*

Gary McFETRIDGE
and SAIF Corporation,
*Petitioners on Review,*

*and*

DEPARTMENT OF CONSUMER
AND BUSINESS SERVICES,
*Intervenor.*

(WCB 02-01738; CA A122013; SC S52964)

149 P3d 1111

David L. Runner, Salem, argued the cause and filed the brief for petitioners on review.

R. Adian Martin, Portland, argued the cause for respondent on review.

Judy C. Lucas, Assistant Attorney General, Salem, argued the cause and filed the brief for intervenor. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before De Muniz, Chief Justice, and Carson, Gillette, Durham, Balmer, and Kistler, Justices.**

GILLETTE, J.

** Riggs, J., retired September 30, 2006, and did not participate in the consideration or decision of this case. Walters, J., did not participate in the consideration or decision of this case.

**GILLETTE, J.**

In this workers' compensation case, the issue is how to calculate temporary total disability benefits for an injured seasonal worker (claimant) under applicable laws and regulations. The Court of Appeals held that those benefits should be calculated based on claimant's average weekly earnings for the period that he actually worked before the injury, rather than over the previous 52 weeks (which included a period when the worker was not employed). *Tye v. McFetridge*, 199 Or App 529, 112 P3d 435 (2005). For the reasons that follow, we now affirm the decision of the Court of Appeals.

With a single exception that we note below, the facts are undisputed. The Court of Appeals described them this way:

"For 20 years, claimant has been a logger and mill worker. He works seasonally in Wallowa County. The work season is determined by the ground conditions for logging and when the local mill will begin accepting logs. Typically, he is off for about five months when the forests are too wet for logging. He began working for McFetridge (employer), doing business as Haywire, on November 30, 1998, and that season continued through March 1, 1999. The next season ran from June 15, 1999 to February 22, 2000. Claimant began work again on June 1, 2000, and continued until January 26, 2001. He started the following season on July 1, 2001. On November 21, 2001,[1] claimant sustained the injury that is the subject of this claim. At the time, the season was expected to continue for several months. During all of the described seasons, claimant worked for employer. After the last two seasons, claimant filed unemployment claims listing Haywire as his 'most recent,' 'second most recent,' and 'third most recent' employer, mirroring the seasons indicated above. For each of those periods, he checked the box 'Lack of Work' as reflecting the reason for the end of his employment. The claim information submitted by employer states that claimant worked eight-hour shifts Monday through Friday and that his wages were $22 per

---

[1] Hospital and medical reports in the record state that claimant was injured on November 23, 2001.

hour. Claimant testified that his work hours could vary between 35 and 42 hours per week. The administrative law judge (ALJ) found that '[c]laimant had been working at an hourly rate of $22.00 per hour over work weeks ranging from 35 to 40 to 42 hours since returning to work on or about July 1, 2001[,]' and there is substantial evidence in the record to support those findings."

*Tye*, 199 Or App at 531 (brackets in original).

After claimant was injured, he filed a workers' compensation claim with his employer's insurer, SAIF. SAIF initially denied the claim, but it eventually notified claimant that it would accept the claim, although it would calculate his temporary disability payment by averaging his weekly wages for the entire 52-week period preceding his injury, a period that included about 22 weeks when claimant had been laid off.

Claimant requested a hearing on the matter. The ALJ directed SAIF to recalculate claimant's temporary disability payments based on claimant's average weekly wages for the 52-week period before he was injured, excluding the period between January and July 2001 when he was not working. The ALJ ruled that that outcome was required under the applicable statute and regulations. In particular, the ALJ observed that ORS 656.210(2)(d)(A) requires an individual's temporary disability compensation to be calculated based on "the wage of the worker at the time of injury." And, the ALJ noted, the applicable Workers' Compensation Division rule for seasonal and other irregularly employed workers who had worked less than 52 weeks or where extended gaps existed in their work history was OAR 436-060-0025(5)(a)(A),[2] which directs insurers to use "the actual weeks of employment (excluding any extended gaps) with the employer at injury up to the preceding 52 weeks." Accordingly, the ALJ ruled that the calculation of claimant's temporary disability payments should not include the period of time that claimant was laid off.

---

[2] We set out the provisions of OAR 436-060-0025 and ORS 656.210 in the text below.

SAIF requested review before the Workers' Compensation Board (board). The board adopted the ALJ's findings of fact but reversed the ALJ's legal ruling. The board held that, because claimant knew that there would be seasonal gaps in his employment, and because he and employer had contemplated such gaps when they formed their employment relationship, the January through July period when claimant was not working did not qualify as an "extended gap" under OAR 436-060-0025(5)(a)(A) and, therefore, had to be included in the computation of claimant's average weekly wage.[3]

Claimant sought judicial review of the board's decision in the Court of Appeals. Claimant asserted that the board's conclusion that the 22-week period in which he was not working was not an "extended gap" under OAR 436-060-0025 was erroneous. The Court of Appeals reversed the board's decision, but on another ground. The court analyzed the applicable rule and concluded that the directive to exclude "extended gaps" from the weekly wage computation applies only in those cases in which a worker was regularly employed for the 52 weeks preceding the injury. *Tye*, 199 Or App at 535. Because the board found that the wage issue turned on whether claimant's gap was "extended," the Court of Appeals concluded that the board had to have found, albeit implicitly, that claimant was regularly employed by employer for the 52 weeks preceding his injury. *Id.* But, according to the Court of Appeals, there was no evidence in the record to support that finding.[4] *Id.* at 536. Therefore, the

---

[3] Throughout its Order on Review, the board referred to a "15-week period" in which claimant was not working, "from January 2002 through June 2002," and stated that claimant was injured in "November 2002." The record is clear that claimant was injured in November *2001* and that the relevant seasonal unemployment period was between January 26 and July 1, 2001. That is a 22-week, not a 15-week, gap. For purposes of this opinion, we assume that the board would have reached the same conclusion had it been aware that the gap actually was 22 weeks long.

[4] ORS 656.210(2)(e) defines the phrase "regularly employed" to mean "actual employment or availability for such employment." The regulation contains the same definition. OAR 436-060-0025(3) (so providing). As the Court of Appeals interpreted the phrase, a worker is not "available for such employment" under OAR 436-060-0025(3) when the employer has no work for the worker to do. *Tye*, 199 Or App at 535-36. Because the question whether claimant was "regularly employed" is not essential to our analysis in this case, we do not need to decide whether the Court of Appeals' interpretation of the phrase "availability for such employment" was correct.

court concluded, the board should have viewed claimant as a worker who had been employed for fewer than 52 weeks. *Id.* And, in such a case, the rule directs that claimant's average weekly wage be calculated on the basis of the weeks he had actually worked. *Id.* We allowed SAIF's petition for review.

■        We begin our analysis with the operative statute. ORS 656.210[5] sets out a scheme for compensating workers who temporarily are totally disabled through an on-the-job injury or an occupational disease. Subsection (1) of that statute provides that such workers generally shall receive compensation equal to two-thirds of their weekly wages. Subsection (2) then provides, in part:

> "For purposes of this section, the weekly wage of workers shall be ascertained:
>
> "(a)   For workers employed in one job at the time of injury, by multiplying the daily wage the worker was receiving by the number of days per week that the worker was regularly employed.
>
> "* * * * *
>
> "(d)   For the purpose of this section:
>
> "(A)   The benefits of a worker who incurs an injury shall be based on the wage of the worker at the time of injury.
>
> "* * * * *
>
> "(e)   As used in this subsection, 'regularly employed' means actual employment or availability for such employment. For workers not regularly employed and for workers with no remuneration or whose remuneration is not based solely upon daily or weekly wages, the Director of the Department of Consumer and Business Services, by rule,

---

[5] In its decision in this case, the Court of Appeals applied the versions of the statute and rule that were in effect at the time of claimant's injury. More recent amendments to ORS 656.210 change the numbering of the applicable subsections but do not otherwise affect our analysis of this case. Therefore, for ease of reference, we refer in this opinion to the current version of that statute. More recent amendments to the rule also do not affect our analysis in this case, but they change the rule in a way that would complicate our discussion. Accordingly, we continue to refer in this opinion to the version of the rule—OAR 436-060-0025 (1996)—that was in effect at the time claimant was injured.

may prescribe methods for establishing the worker's weekly wage."

In this case, it is undisputed that claimant was paid an hourly wage, based on the number of hours that he worked in a given week, rather than a daily or weekly wage. Claimant's "remuneration," therefore, "is not based solely upon daily or weekly wages." It follows that claimant was not "regularly employed" under ORS 656.210(2)(e) for purposes of computing the wages on which to base his temporary total disability compensation. Rather, the statute requires that we derive claimant's weekly wages through the method that the Department of Consumer and Business Services (DCBS) has established by rule. That method determines the "wage of the worker at the time of injury" because, under the statute, that is the wage on which benefits "shall be based." ORS 656.210(2)(d)(A).

DCBS established that method in OAR 436-060-0025. At the time that claimant was injured, that rule provided, in part:

"(3) The rate of compensation for regularly employed workers shall be computed as outlined in ORS 656.210 and this rule. As used in this rule, 'regularly employed' means actual employment or availability for such employment.

"* * * * *

"(5) The rate of compensation for workers regularly employed, but paid on other than a daily or weekly basis, or employed with unscheduled, irregular or no earnings shall be computed on the wages determined by this rule. * * *

"(a) For workers employed seasonally, on call, paid hourly, paid by piece work or with varying hours, shifts or wages:

"(A) Insurers shall use the worker's average weekly earnings with the employer at injury for the 52 weeks prior to the date of injury. For workers employed less than 52 weeks or where extended gaps exist, insurers shall use the actual weeks of employment (excluding any extended gaps) with the employer at injury up to the previous 52 weeks. For workers employed less than four weeks, insurers shall use the intent of the wage earning agreement as confirmed

by the employer and the worker. For purposes of this section, the wage earning agreement may be either oral or in written form."

OAR 436-060-0025 (1996).

At the time of his injury, claimant, as an hourly employee, was "regularly employed but paid on other than a daily or weekly basis" and, therefore, under OAR 436-060-0025(5) (1996), claimant's "rate of compensation * * * shall be computed on the wages determined by this rule."

In addition, claimant was a seasonal worker. For both seasonal workers and hourly workers (as well as workers employed under certain other types of arrangements—workers on call, paid by piece work, or having varying hours, shifts or wages), the applicable part of "this rule" is OAR 436-060-0025(5)(a) (1996), which instructs insurers to compute average weekly earnings using the directives set out in the following subparagraph, OAR 436-060-0025(5)(a)(A) (1996). The central area of disagreement in this case is over which of the directives in that subparagraph obtains in claimant's situation.

■■ In interpreting an administrative rule such as OAR 436-060-0025(5)(a)(A) (1996), our task is the same as that involved in determining the meaning of a statute, which is to discern the meaning of the words used, giving effect to the intent of the body that promulgated the rule. *Abu-Adas v. Employment Dept.*, 325 Or 480, 485, 940 P2d 1219 (1997). And in so doing, we follow the same methodology for interpreting rules as for construing statutes. *Id.* That is, we begin by examining the text of the rule itself, together with its context. *Marshall's Towing v. Department of State Police*, 339 Or 54, 62, 116 P3d 873 (2005). Context includes other provisions of the same rule, other related rules, the statute pursuant to which the rule was created, and other related statutes. *Abu-Adas*, 325 Or at 485. If the promulgating body's intent is clear after that inquiry, the court does not proceed further. *Id.*

OAR 436-060-0025(5)(a)(A) (1996) begins with the following general statement: "Insurers shall use the worker's average weekly earnings with the employer at injury for the

52 weeks prior to the date of injury." That statement is followed by a somewhat different rule "[f]or workers employed less than 52 weeks or where extended gaps exist." For those workers, the "insurers shall use the actual weeks of employment (excluding any extended gaps) with the employer at injury up to the previous 52 weeks." Finally, subparagraph (5)(a)(A) provides a third rule for workers employed for fewer than four weeks. For those workers, insurers are required to ascertain the intent of the parties.

The literal wording of the first sentence of subparagraph (5)(a)(A) suggests that it applies to all injured workers in all situations. Nonetheless, all three sentences appear in the same subparagraph setting out rules for computing average weekly salary for temporarily totally disabled workers. The second and third sentences clearly differentiate treatment according to the length and continuity of the worker's employment. That is, the second sentence applies to workers who have been employed for fewer than 52 weeks and to workers with "extended gaps" in their employment. A worker who has been employed for fewer than 52 weeks also may have "extended gaps" but, in all those cases, the earnings computation rule is clear: insurers "shall use the actual weeks of employment (excluding any extended gaps) with the employer at injury." The third sentence applies to workers who have been employed for fewer than four weeks and, again, the instructions to the insurer are clear: ascertain the intent of the parties. It is appropriate to infer from the foregoing that the computation rule set out in the first sentence covers workers who are not covered by the other two sentences, *i.e.*, workers who have been employed continuously for the 52 weeks preceding the injury, including those workers whose employment during that period contains gaps that were not "extended." For those workers, insurers are directed to average all earnings over the prior 52-week period.

It also is beyond reasonable dispute that the weekly wages of any of the workers to whom OAR 436-060-0025(5)(a)(A) (1996) applies, *i.e.*, seasonal workers, hourly workers, workers on call, workers paid by the piece, and workers having varying hours, shifts, or wages, could be determined by reference to the applicable sentence in subparagraph (5)(a)(A), depending on the particular circumstances of the case. That is, at the time of injury, any one of

those workers could have been employed for 52 weeks or for fewer than 52 weeks, with extended gaps or with gaps that were not extended (or with no gaps at all), or for fewer than four weeks. In each case, the rule applicable to that situation would apply.[6]

SAIF contends, to the contrary, that the weekly wages of seasonal workers who have worked for one employer for more than one season *always* are calculated by reference to the first sentence of OAR 436-060-0025(5)(a)(A) (1996), requiring insurers to average weekly earnings over the previous 52-week period. That is so, according to SAIF, because that first sentence refers to the worker's earnings "with the employer at injury" for the 52 weeks prior to the date of injury, and a worker who has worked multiple annual seasons with the same employer would have earnings with the employer at injury for a period of 52 weeks or more. Moreover, SAIF asserts, that sentence does not specify that it applies only to workers who have been employed continuously and that sentence is found immediately after an introductory sentence referring to seasonal workers whose employment is, by definition, noncontinuous. That first sentence then, must apply to the wages of seasonal workers who have worked more than one season for the same employer. Finally, according to SAIF, the second sentence of subparagraph (5)(a)(A), addressing workers who have been employed for fewer than 52 weeks or who have extended gaps, does *not* logically apply to a seasonal worker, because gaps that inhere in the very concept of seasonal work cannot be "extended" for purposes of calculating average weekly wages.

As is evident from our discussion above, we disagree. When OAR 436-060-0025(5)(a) (1996) is read together with the three sentences of OAR 436-060-0025(5)(a)(A) (1996), it is clear that the rule used for calculating average weekly wages in subparagraph (5)(a)(A) for any of the types of workers described in paragraph (5)(a) depends on the circumstances. For example, a seasonal worker can have been employed for fewer than 52 weeks or, for that matter, fewer than four weeks, before suffering an on-the-job injury, as could an hourly worker, a piece worker, or a worker with varying shifts. In any of those cases, the rule set out in the second or

---

[6] DCBS agrees with the foregoing interpretation of its rule.

third sentence would apply. There is no textual basis for concluding that only one provision of subparagraph (5)(a)(A) applies to seasonal workers or that a seasonally employed worker cannot have an "extended gap" in his employment. Moreover, as we discuss in more detail below, the fact that a seasonal worker has worked for the same employer for more than one season does not automatically mean that the first sentence of OAR 436-060-0025(5)(a)(A) (1996) applies. Nor does it otherwise change our conclusion that the applicability of one of the three methods set out in OAR 436-060-0025(5)(a)(A) (1996) for calculating weekly wages depends on the circumstances of the case.

It follows from the foregoing that the outcome of the present matter hinges on the factual question whether claimant was "employed" by employer for 52 weeks prior to his injury or for fewer than 52 weeks. The board found as follows:

> "Claimant and the employer understood from the beginning of his employment that claimant's work would follow a seasonal pattern, with no work during periods—typically for about 5 months—when the woods were too wet for logging and the employer did not have 'clean up' contracts. * * * Claimant began working as a logger for the employer on November 30, 1998 and he worked until March 1, 1999, when work stopped that season. He began working again on June 15, 1999 and continued until February 2000; he began working again on June 1, 2000 and continued until January 2001. In [2001], claimant began working on July 1, [2001] and continued until his November 23, [2001] injury. Each year, claimant stopped working as of the employer's annual seasonal layoff—until he was disabled after his injury in November [2001]."

The board made no other specific finding concerning claimant's and employer's relationship. Instead, the board addressed the meaning of the term "extended gap" in OAR 436-060-0025(5)(a)(A) (1996), ultimately concluding that the January to July 2001 period when claimant was not working was not an "extended gap" under that rule.

On appeal, as noted, the Court of Appeals held that there was no evidence in the record that claimant was "regularly employed" during the period of seasonal layoff. Thus, the court held that claimant began "regular employment"

with employer on July 1, 2001, and there were no gaps in his employment, extended or otherwise, between that date and the date of his injury.[7] *Tye*, 199 Or App at 536. Accordingly, the court held that SAIF should calculate claimant's disability benefits based on his average weekly wages between July 1 and November 23, 2001. *Id.* at 539.

■    SAIF criticizes the Court of Appeals for basing that ruling on what SAIF characterizes as an erroneous "factual assumption that claimant's employment with the employer began on July 1, 2001." It argues that the court must accept any board findings that are supported by substantial evidence and that the Court of Appeals was not entitled to make a factual assumption that is at odds with the board's factual findings. SAIF argues that it is necessary to infer from the board's findings and its ultimate conclusion that claimant had one continuous employment relationship with employer from 1998 until the time of his injury in November 2001, with seasonal gaps.[8]

SAIF is correct that this court is bound by the board's *factual* findings, if there is substantial evidence in the record to support them. ORS 656.298(7); ORS 183.482(7) and (8); *Garcia v. Boise Cascade Corp.*, 309 Or 292, 295-96, 787 P2d 884 (1990). As this court stated in *Garcia*,

> "substantial evidence supports a finding when the record, viewed as a whole, permits a reasonable person to make the finding. ORS 183.482(8)(c). A court must 'evaluate the substantiality of supporting evidence by considering all the evidence in the record.' * * * That is, the court must evaluate evidence against the finding as well as evidence supporting

---

[7] As noted above, the Court of Appeals found it necessary to determine whether claimant was "regularly employed," as that phrase is used in OAR 436-060-0025(3) and (5) (1996), during the layoff period. That court concluded, after some analysis of that phrase and its definition in OAR 436-060-0025(3) (1996), that claimant was not "regularly employed" during the layoff period because he was not "actually employed," nor was he "available for such employment" because there was no evidence in the record that employer had work for him to do during that period. *Tye*, 199 Or App at 536. Because we conclude that claimant was not in an employment relationship with employer that spanned the layoff period, and, therefore, that he was not employed during that period at all, we need not address the meaning of the phrase "regularly employed."

[8] For his part, claimant argues, simply, that he entered into a new employment relationship at the beginning of each logging season.

it to determine whether substantial evidence exists to support that finding. If a finding is reasonable in light of countervailing as well as supporting evidence, the finding is supported by substantial evidence."

*Garcia*, 309 Or at 295 (citations omitted).

Here, however—and even assuming that the findings that SAIF postulates are factual ones, rather than legal conclusions—the board did not specifically find that claimant had one continuous employment relationship with employer that spanned several years. Rather, the board found that petitioner worked for employer off and on, in a "seasonal pattern" involving a period of work followed by "employer's annual seasonal layoff." A "layoff," in common parlance, is a period of *unemployment*. That interpretation of the board's actual factual finding is amply supported in the record: Claimant twice filed for unemployment compensation during the layoff period, listing employer as his first, second, and third most recent employers. That fact shows that claimant viewed the employment relationship with employer as having terminated when he was laid off. On the other side of the coin, nothing in the record suggests that claimant and employer had entered into any sort of contractual arrangement, oral or written, that either would have *entitled* claimant to return to work at the end of the seasonal layoff or *required* employer to put claimant to work again.

It follows that, to the extent that the board's ruling depends on a factual inference that claimant had a continuous employment relationship that spanned the "seasonal layoff," we reject it as unsupported by substantial evidence in the record. That factual proposition on which SAIF relies thus is unavailable, and SAIF's arguments fail.

In our view, the record is clear that claimant began his employment with employer on July 1, 2001. Claimant, therefore, had been employed for fewer than 52 weeks at the time of his injury on November 23, 2001. In that case, the second sentence of OAR 436-060-0025(5)(a)(A) (1996) requires SAIF to calculate claimant's disability benefits based on the wages that claimant earned during the particular weeks that he actually worked for employer, *i.e.*, between July 1 and

November 23, 2001. The Court of Appeals was correct in so holding.

The decision of the Court of Appeals is affirmed. The case is remanded to the Workers' Compensation Board for further proceedings.