Argued and submitted December 15, 2011, affirmed April 4, petition for review denied June 28, 2012 (352 Or 170)

PROTECT GRAND ISLAND FARMS,
*Petitioner,*

*v.*

YAMHILL COUNTY
and Baker Rock Resources,
*Respondents.*

Land Use Board of Appeals
2011035; A149819

275 P3d 201

Courtney Johnson argued the cause for petitioner. With her on the brief were Ralph Bloemers and Crag Law Center.

Timothy S. Sadlo argued the cause and filed the brief for respondent Baker Rock Resources.

No appearance for respondent Yamhill County.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

## SERCOMBE, J.

Petitioner Protect Grand Island Farms seeks judicial review of a final order of the Land Use Board of Appeals (LUBA). That order affirmed a Yamhill County ordinance amending its comprehensive plan to add a 224.5-acre site to its inventory of significant mineral and aggregate resources under Statewide Planning Goal 5 (Natural Resources, Scenic and Historic Areas, and Open Spaces).[1] Petitioner argues that the aggregate resource site was not "significant" because the "average thickness of the aggregate layer within the mining area" did not exceed 25 feet as required by OAR 660-023-0180(3)(d)(B)(ii). Petitioner contends that the county and LUBA improperly applied that rule by treating two distinct aggregate layers—an upper deposit and a lower deposit that were separated by an intervening layer of clay—as a single layer for purposes of determining the thickness of the aggregate. In petitioner's view, the county was precluded from considering more than one deposit in calculating the "thickness of the aggregate layer." We review to determine whether LUBA's order was "unlawful in substance" under ORS 197.850(9)(a) and, for the reasons set forth below, affirm.

We begin with a brief overview of the legal and factual context. Statewide Planning Goal 5 requires local governments to inventory and protect, among other natural resources, mineral and aggregate resources. Pursuant to that policy, the Land Conservation and Development Commission (LCDC) has adopted standards to ensure that local governments comply with their Goal 5 planning obligations when conducting periodic review or amending acknowledged comprehensive plans and land use regulations. OAR 660-023-0180 sets forth the standards for aggregate resources. That rule requires that local governments determine whether an aggregate resource site is "significant" before adding the site to its inventory. As relevant here, a proposed aggregate resource site is "significant" if the aggregate material meets certain Oregon Department of Transportation (ODOT) quality specifications and the estimated amount of the material is

---

[1] "Aggregate resources" are "naturally occurring concentrations of stone, rock, sand gravel, * * * and other naturally occurring solid materials commonly used in road building or other construction." OAR 660-023-0180(1)(a).

more than 2,000,000 tons for sites in the Willamette Valley. OAR 660-023-0180(3)(a). However, even if those criteria are met, an aggregate site in Yamhill County is not "significant" if more than 35 percent of the proposed mining area consists of Class I or Class II soils, "unless the average thickness of the aggregate layer within the mining area exceeds" 25 feet. OAR 660-023-0180(3)(d)(B)(ii). The "thickness of the aggregate layer" is defined as "the depth of the water-lain deposit of sand, stones, and pebbles of sand-sized fraction or larger, minus the depth of the topsoil and nonaggregate overburden." OAR 660-023-0180(1)(l).

In this case, Baker Rock Resources (Baker Rock) applied for an amendment to Yamhill County's comprehensive plan to add a 224.5-acre site to the county's inventory of significant mineral and aggregate resources. The site was zoned for Exclusive Farm Use, and all of its soils were categorized as Class II soils. Baker Rock proposed to mine roughly 175 acres of the site for aggregate to be used in the production of asphalt and concrete.

As part of its application, Baker Rock submitted a geology report based on borehole samples taken throughout the property. That report detailed the location and composition of aggregate within the mining site. Among other things, it explained that "[t]he sand and gravel resource exists in two distinct horizons beneath the subsoil." Baker Rock's application summarized the relevant data this way:

"Geological analysis of the data collected indicates that there are two distinct layers of sand and gravel on the site, separated by a layer of clay. The upper layer averages 23 feet in thickness, and the lower layer averages 21 feet in thickness. Both layers are easily mineable using available technologies. The upper layer will be mined 'wet,' and the operating cell will be temporarily dewatered to mine the lower layer of aggregate.

"The average thickness of both aggregate layers available for mining on the site is 44 feet * * *."

The report estimated that the site contained 23.6 million tons of high-quality alluvial sand and gravel. It also confirmed that the aggregate within the site met the ODOT specifications for soundness and durability.

In addition to the report, Baker Rock presented written testimony from its geology expert, who opined that all of the sand and gravel within the proposed mining site was part of the Willamette Aquifer and was deposited by the "modern Willamette River" during the Holocene Epoch (after the last ice age concluded). According to the expert, intervening layers of silt and clay "are common and expected, in alluvial seams and pockets, in Willamette River aggregate deposits." The expert indicated that below the Willamette Aquifer was a stratum known as the "Willamette Confining Unit," which separated the Holocene deposits from the older, softer, and less sorted "Pleistocene Epoch sands and gravels *'* * deposited by glacial age streams," which Baker Rock did not propose to mine.

Based on that information, the expert concluded that the aggregate resource "above the [clay] seam split, and below the seam split, is the same rock" deposited during "the same geological period, by the same river, and functionally by the same hydrological processes." Thus, the expert opined that all of the sand and gravel within the mining area was a single "geologic unit." In the expert's view, the "presence of a silt/clay strat[um] in the deposit" was of no geologic moment: it did not serve as a boundary but merely represented a period of "quiescent deposition."

The county, relying on the expert's assessment, ultimately approved an ordinance adding the site to its inventory of significant aggregate resources. In doing so, it concluded that the "average thickness of the aggregate layer" within the proposed mining site exceeded 25 feet, considering the aggregate both above and below the clay layer. It based that determination on two alternate theories. First, it concluded that the clay layer was "nonaggregate overburden" that could be subtracted from the thickness of the aggregate:

> "All of the overburden at the site, even the clay overburden within the deposit, is located above identified sand and gravel deposits within the mining area. * * * The Goal 5 rule does not require or compel the County to refuse to acknowledge the presence of a significant aggregate resource at the site * * * solely because the deposit contains clay interbeds.

"* * * [T]he 'thickness of the aggregate layer' includes the entire depth of mineable aggregate within the mining area, minus the overburden, regardless of whether the overburden is found in one, or more than one location, where it must be removed in order to obtain quality sand and gravel located below it."

In support of that interpretation, the county relied on a letter from the Department of Land Conservation and Development, which took the position that the "average thickness of the aggregate layer" was established by "averaging the vertical depth of the aggregate planned to be excavated within the mining area. In other words, the rule does not consider the existence of one or more areas of non-aggregate as relevant to determining the average thickness of the aggregate layer * * *." The county also reasoned that its interpretation was consistent with the purpose of the rule, which, according to the county, was to strike a balance between the protection of farmland and the need for local supplies of aggregate for construction—"mining the least amount of farmland to obtain the greatest yield of sand and gravel."

Alternatively, the county concluded that the term "layer" in "thickness of the aggregate layer" referred to deposits made during the same geologic epoch. Thus, because all of the aggregate within the proposed mining site was deposited during the Holocene Epoch, the county reasoned that it constituted a single "layer" for purposes of the rule.

Petitioner appealed the county's decision to LUBA, arguing, among other things, that the county misconstrued the meaning of the phrase "thickness of the aggregate layer" in OAR 660-023-0180(3)(d)(B). LUBA affirmed the county's decision:

"Nothing in the language of the rule definitively addresses the question presented in this appeal, and it is probable that the rule drafters simply did not anticipate the circumstances present in this appeal when drafting the rule. However, we agree with the county that it is not inconsistent with the text or purpose of the rule to consider the intervening clay layer to constitute 'overburden' for purposes of mining the lower aggregate deposit as proposed. Certainly once the upper deposit is mined as proposed, the clay layer lying

over the lower deposit could only be described as over-burden.

"In addition, it is undisputed that aggregate that is present both above and below the clay layer is of nearly identical quality. It is also undisputed that [Baker Rock] plans to mine all of the aggregate present at the mining site, and that it is apparently no more difficult or expensive to mine the aggregate that is below the clay than it is to mine the aggregate that is above the clay. Finally, it is undisputed that mining the aggregate below the clay will result in no greater area of high value soils being removed from farm use than would already be removed to mine the aggregate located above the clay. Under those circum-stances, we think the county's understanding of the rule is correct, and its consideration of the thickness of the entire aggregate deposit to be mined while subtracting the inter-vening clay layer is consistent with the rule."

LUBA did not reach the county's alternative construction of the rule.

Petitioner now seeks review of LUBA's order, assigning error to its interpretation of the requirement in OAR 660-023-0180(3)(d)(B) that "the average thickness of the aggregate layer within the mining area" exceed 25 feet. Petitioner argues that the plain language of the rule, which refers to *"the* aggregate *layer"* and *"the* water-lain *deposit,"* limits the consideration of "thickness" to a single layer or deposit of aggregate. (Emphasis added.) According to peti-tioner, LUBA's interpretation of the rule improperly permit-ted the county to "sum[ ] the average thicknesses of two sep-arate and distinct aggregate layers on the site." Petitioner further argues that the clay layer cannot be excluded as "overburden" and that, even if it can, it still serves to sever the aggregate resource into two distinct deposits. Finally, petitioner argues that LUBA's construction would render the rule meaningless because "virtually any site in the Willamette Valley floodplain would pass the aggregate thick-ness test" if an applicant were permitted to "add up" inter-mittent layers of aggregate to an infinite depth.

Baker Rock responds that LUBA correctly inter-preted "the average thickness of the aggregate layer" stan-dard in OAR 660-023-0180(3)(d)(B). Baker Rock advances no

textual analysis in support of that argument but, instead, apparently relies on the county's and LUBA's interpretations. Baker Rock additionally relies on the fact that "all of the aggregate identified by the applicant, from top to bottom, is the same high-quality, well-graded alluvial sand and gravel, all deposited during the Holocene * * * Epoch." It then asserts that "[i]t was reasonable for the county to consider th[o]se facts as one way to establish that all of the resource identified * * * on the site [is] part of the same 'water-lain deposit of [aggregate]' and [is] properly considered when calculating the 'average thickness of the aggregate layer.'" (Emphasis omitted.)

The parties' contentions require us to interpret OAR 660-023-0180(3)(d)(B) to determine what portion of the aggregate resource within the mining site can be considered in calculating the average "thickness of the aggregate layer." In construing an administrative rule, we employ the same methodology as we do for construing statutes. *Tye v. McFetridge*, 342 Or 61, 69, 149 P3d 1111 (2006). We examine the text of the rule in context to discern the intent of the body that promulgated the rule. *Id.*; *see also State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (setting forth interpretive methodology).

As noted, OAR 660-023-0180(3)(d)(B) requires that, in this case, "the average thickness of the aggregate layer within the mining area" exceed 25 feet. "Thickness of the aggregate layer" is defined as "the depth of the water-lain deposit of sand, stones, and pebbles of sand-sized fraction or larger, minus the depth of the topsoil and nonaggregate overburden." OAR 660-023-0180(1)(l). The components of that definition—such as "deposit" and "overburden"—are not further defined within the rule.

We give words of common usage their plain and ordinary meaning. *PGE v. Bureau of Labor and Industries,* 317 Or 606, 611, 859 P2d 1143 (1993). "Deposit" means "a natural accumulation" or "something laid, placed, or thrown down," especially "matter deposited by some natural process." *Webster's Third New Int'l Dictionary* 605 (unabridged ed

2002). "Overburden" is defined, in relevant part, as "consoli-dated or unconsolidated material overlying a deposit of use-ful geological materials (as a coal seam or an ore body)." *Webster's* at 1606. The context implies a similar meaning. ORS 517.750, which concerns the reclamation of mining lands, defines "overburden" as "the soil, rock and similar materials that lie above natural deposits of minerals." Although OAR 660-023-0180(1) does not cite that definition of "overburden," the rule cites several other definitions in ORS 517.750 and, therefore, provides a basis for presuming that the body enacting the rule was aware of it.

The foregoing definitions suggest that an "aggregate layer" is a natural accumulation of sand, stones, and pebbles set down by water, minus topsoil and nonaggregate material overlying useful deposits. All of the aggregate resource at issue in this case—both above and below the nonaggregate material—is naturally accumulated sand, stone, and pebbles deposited by flowing water. The question remains, however, whether all of that aggregate may be considered part of the "aggregate layer" within the meaning of the rule, where non-aggregate material rests within or between the aggregate. Stated differently, we must determine whether the term "aggregate layer" is meant to encompass all of the aggregate within a resource site, regardless of whether the aggregate exists in discontinuous deposits, or whether the term is meant only to refer to a single, discrete, unbroken concentra-tion of aggregate, distinguishable from other concentrations of aggregate within the same site that are physically sepa-rated by other materials.

Nothing in the definition itself seems to immediately resolve the significance of the nonaggregate material. That is, the definition does not fix the temporal or spatial bounda-ries of an "accumulation" or indicate explicitly whether an accumulation is interrupted by the existence of nonaggregate material. As noted, petitioner argues that the reference to "the * * * deposit" in the definition of "aggregate layer" is intended to limit the application of OAR 660-023-0180 to a single, continuous deposit. Petitioner is correct that, in many cases, use of the definite article "the," followed by a singular noun, conveys an intent to refer to one particular thing. *See, e.g., Carrillo v. City of Stanfield*, 241 Or App 151, 157, 255

P3d 491 (2011) (statutory reference to "the contract" construed to mean "one particular contract"); *State v. Branam*, 220 Or App 255, 260, 185 P3d 557, *rev den*, 345 Or 301 (2008) (statutory reference to "the sentence" construed to mean "only one particular sentence"). Nonetheless, that is not the only plausible construction. *See, e.g., State v. Rowland*, 245 Or App 240, 245, 262 P3d 1158 (2011), *rev den*, 351 Or 675 (2012) ("Although the statute refers to 'the confinement,' we do not agree with defendant that the legislature thereby intended to refer only to a single confinement."). Thus, we must look beyond the text to determine whether "the * * * deposit" refers to only a single, continuous deposit or whether it refers to deposits collectively. The context of the rule does not indicate which construction was intended, and there is no relevant history surrounding the rule's adoption.

To the extent that text and context do not resolve ambiguity in the rule, we may resort to maxims of construction. One such maxim is that "we are to construe the language of a [rule] in a manner that is consistent with its purpose[.]" *Branam*, 220 Or App at 263. Here, the parties agree that the purpose of the rule is to balance the protection of farmland against the need for local sources of aggregate. By confining mining operations to places where the vertical depth of the resource is substantial, the rule forces mining operators to limit the horizontal reach of their mining sites. Thus, where a farmland mining site contains an aggregate resource that runs miles wide but only 10 feet deep, mining would be precluded although the overall yield of aggregate would be great. That is because it would result in the destruction of significant amounts of farmland. Instead, mining operators must find sites that yield similar overall quantities of aggregate but that result in less destruction of farmland; that is, they must find vertically deep resources of aggregate.

That purpose suggests that the rule was not intended to prohibit the mining of deep, but discontinuous, resources of aggregate. For instance, where the mining site is composed of vertically discontinuous aggregate deposits of 26 feet (upper deposit) and 20 feet (lower deposit), it is unlikely that LCDC would have intended to preclude mining of the lower deposit or to require that deposit to independently meet the thickness requirement, because no greater

protection of farmland would result. Similarly, where a mining site is composed of several substantial but discontinuous deposits of aggregate, none of which independently meet the thickness requirement but which collectively far exceed it, it is unlikely that LCDC would have intended to prevent mining of the aggregate resource. At bottom, the rule permits the destruction of farmland for mining where the depth of the aggregate resource is sufficiently substantial; it makes no sense, then, to prevent the mining of a deep deposit of aggregate merely because it also contains areas of nonaggregate (assuming all of the aggregate is in fact commercially mineable).

In light of the purpose of the rule, we conclude that the "average thickness of the aggregate layer within the mining area" is intended to refer to the average depth of all the mineable aggregate within the resource site, regardless of whether that aggregate is physically discontinuous. Pursuant to the rule, the topsoil and overburden are then excluded from the calculation of the average thickness. Consistently with that interpretation, "overburden" includes all nonaggregate material that lies above any deposit of aggregate proposed to be mined, that is, any nonaggregate that must be removed to access an aggregate resource.

Applying that construction here, the depth of aggregate resource throughout the mining site averaged 44 feet. Thus, under OAR 660-023-0180(3)(d)(B)(ii), the aggregate resource was "significant."

Affirmed.