Kristine M. PHILLIPS,
*Petitioner,*

*v.*

DEPARTMENT OF PUBLIC SAFETY
STANDARDS AND TRAINING,
*Respondent.*

Department of Public Safety Standards and Training
28751; A150444

364 P3d 717

Kevin T. Lafky argued the cause for petitioner. With him on the briefs were Tonyia J. Brady and Lafky & Lafky.

Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

SERCOMBE, P. J.

## SERCOMBE, P. J.

Petitioner seeks judicial review of a final order of the Department of Public Safety Standards and Training (DPSST) that revoked her certifications as a corrections officer on the ground that she failed to meet minimum moral fitness standards. Petitioner raises two assignments of error. We reject her second assignment without discussion and write to address her first assignment, in which petitioner asserts that DPSST erred when it concluded, on summary determination, that petitioner engaged in conduct that demonstrated disregard for the rights of others, OAR 259-008-0070(4)(b)(B), misuse of authority, OAR 259-008-0070(4)(b)(C), and misconduct, OAR 259-008-0070(4)(b)(E). As explained below, we affirm.

Because it is helpful in understanding the issues in this case, we begin by setting forth some of the legal framework. Pursuant to ORS 181.662(1)(c), a public safety officer's certifications may be revoked based on a finding that "[t]he public safety officer or instructor does not meet the applicable minimum standards, minimum training or the terms and conditions established under ORS 181.640(1)(a) to (d)." ORS 181.640, in turn, directs DPSST to recommend, and the Board on Public Safety and Standards Training (BPSST) to establish, minimum standards for, among other things, moral fitness.[1] *See Cuff v. Department of Public Safety Standards*, 345 Or 462, 465-66, 198 P3d 931 (2008). Pursuant to that directive, BPSST promulgated OAR 259-008-0010.[2] *See Cuff,* 345 Or at 465. That rule provides, in part:

"All law enforcement officers must be of good moral fitness. For purposes of this standard, lack of good moral fitness includes, but is not limited to:

[1] ORS 181.640(1)(a) provides that DPSST shall recommend and BPSST "shall establish by rule reasonable minimum standards of physical, emotional, intellectual and moral fitness for public safety personnel and instructors."

[2] We note that, during the course of litigation, the pertinent administrative rules were amended and, in its decision, DPSST applied the amended rules. In their briefs, the parties rely on the current versions of the rules and do not raise any issue relating to the applicability of the current rules. Therefore, like the parties, we cite to the current version of the applicable administrative rules throughout this opinion.

"(a) Mandatory disqualifying misconduct as described in OAR 259-008-0070(3); or

"(b) Discretionary disqualifying misconduct as described in OAR 259-008-0070(4)."

OAR 259-008-0010(6). Under OAR 259-008-0070(4)(b), discretionary disqualifying misconduct

"includes misconduct falling within the following categories:

"(A) Category I: Dishonesty: Includes untruthfulness, dishonesty by admission or omission, deception, misrepresentation, falsification;

"(B) Category II: Disregard for the Rights of Others: Includes violating the constitutional or civil rights of others, and conduct demonstrating a disregard for the principles of fairness, respect for the rights of others, protecting vulnerable persons, and the fundamental duty to protect or serve the public;

"(C) Category III: Misuse of Authority: Includes abuse of public trust, obtaining a benefit, avoidance of detriment, or harming another, and abuses under the color of office;

"(D) Category IV: Gross Misconduct: Means an act or failure to act that creates a danger or risk to persons, property, or to the efficient operation of the agency, recognizable as a gross deviation from the standard of care that a reasonable public safety professional would observe in a similar circumstance;

"(E) Category V: Misconduct: Misconduct includes conduct that violates the law, practices or standards generally followed in the Oregon public safety profession. By definition, all criminal convictions meet the definition of Misconduct within this category.

"* * * * *

"(F) Category VI: Insubordination: Includes a refusal by a public safety professional to comply with a rule or order, where the order was reasonably related to the orderly, efficient, or safe operation of the agency, and where the public safety professional's refusal to comply with the rule or order constitutes a substantial breach of that person's duties."

Thus, if a law enforcement officer is found to have engaged in conduct that falls within one of the categories listed in

OAR 259-008-0070(4)(b), the officer may have his or her certifications revoked for lack of good moral fitness. *See* OAR 259-008-0070(9) (setting forth procedure for revocation of corrections certifications).

With that context in mind, we turn to the background facts of this case. The following facts from the final order were undisputed on summary determination. Petitioner, who worked as a deputy sheriff for the Marion County Sheriff's Office, was assigned to work at the Marion County Work Center, a "non-secured facility housing certain lower-risk inmates with a maximum capacity of approximately 144 inmates." The facility is divided into four dormitories; each dormitory is a large room with multiple bunk beds. "Inmates are able to come and go from the dormitory into a central hallway. The control room for the facility is located in the central hallway."

In the first incident at issue, petitioner was working the graveyard shift at the work center along with another deputy, Jochums. During that shift, petitioner and Jochums began conducting a routine head count of inmates. Although inmates usually sat quietly on their bunks during head counts, on this occasion a male inmate followed the two deputies, making jokes and annoying them. The deputies requested that the inmate stop following them, but he did not comply. While in an area near the inmate's bed, petitioner handcuffed the inmate's hand to a bunk bed post. "The inmate, the deputies, and other inmates all laughed as this occurred," and, while dragging and tipping the bed, the inmate asked petitioner, "Is that all you got?" She responded by handcuffing the inmate's other hand to another bunk bed. "The inmate was left standing with one hand cuffed to each bunk bed as the deputies left and continued the head count."

After completing the head count, petitioner and Jochums returned to the control room where they "turned out the primary lights to the facility." Petitioner heard laughter coming from the dormitory where she had left the inmate handcuffed. After picking up a camera, she returned to that dormitory where she found the inmate standing, still handcuffed to the two bunks, with his pants down around his ankles. Petitioner attempted to photograph the inmate

and then released him and told him to go to bed. Although she considered her attempt to photograph the inmate to be a joke, petitioner also told Jochums that their handling of the situation with the inmate "probably wasn't very smart."

The following month, in the other incident at issue, petitioner, Jochums, and another deputy, Brown, were on duty at the work center. As a joke, the deputies decided to place two inmates, who were to be released that day, in a holding cell in order to allow other inmates to "say goodbye to them." Petitioner placed the two inmates in the holding cell, and other inmates went to the window of the cell to say goodbye. Jochums and Brown also connected a surveillance camera that petitioner had purchased to a television monitor that could be seen throughout the facility. Brown held the camera to broadcast images of the two inmates in the holding cell to the entire work center. Petitioner then took the camera and "told the inmates to 'do something for the camera.'" In response, the inmates pretended to hug and kiss. After several minutes, petitioner released the two inmates from the holding cell. The inmates were not upset by the incident, in which they had willingly participated.

Petitioner's supervisors learned about the two incidents and, after conducting an investigation, the county imposed a two-day suspension without pay for the holding cell incident and terminated petitioner's employment as a result of the handcuffing incident. A report stating that petitioner had been discharged for cause was forwarded to DPSST, and DPSST issued a notice of its intent to revoke petitioner's certificates pursuant to ORS 181.662(4)[3] and OAR 259-008-0070. In the meantime, petitioner's union filed a grievance to challenge the discharge and that grievance was heard by an arbitrator. In June 2008, the arbitrator issued a decision on the grievance.

With respect to the holding cell incident, the arbitrator noted that the county chose to "charge" petitioner under a section of its code of conduct that "requires that all persons be treated 'with respect and courtesy,'" and, therefore, the

---

[3] Pursuant to ORS 181.662(4), DPSST is to deny, suspend, or revoke the certification of a public safety officer based on a finding that the officer has been discharged for cause from employment as a public safety officer.

arbitrator was required to "evaluate whether the evidence in the record supports a finding that [petitioner] treated [the inmates involved in the incident] with disrespect and/or discourtesy." The arbitrator concluded that the record did not support such a finding, noting that the inmates had willingly engaged in the "horseplay" and had not been offended. However, the arbitrator further observed that petitioner had not acted appropriately during the incident; "[o]n the contrary, she clearly acted unprofessionally[.]" The arbitrator further noted that he did not

> "intend to imply that the County may not prohibit such conduct. In fact, it may well be that other rules, not cited by the County in the discipline letter, could have appropriately supported some form of disciplinary action because of her conduct. I hold merely that the proof in the record does not meet the County's burden to establish a violation of the specific rule relied upon in imposing the suspension."

(Footnote omitted.)

With respect to the handcuffing incident, the arbitrator noted that petitioner had admitted that she

> "acted unprofessionally, that she did not treat [the inmate] with courtesy and respect, that she failed to ensure his safety at all times by leaving him restrained in a dorm without a deputy present, that she used County property (a digital camera) for unofficial purposes, and that she failed to file a required [report.]"

The arbitrator noted that he was "particularly troubled by the fact that * * * [petitioner] and Jochums ultimately left [the inmate] alone in a dorm full of other inmates, wrists cuffed to the vertical posts of separate double bunks with his arms spread apart, facing a wall, and (at least for a portion of the time) in the dark." (Footnote omitted.) In the arbitrator's view, the deputies

> "surely left [the inmate] at a substantial disadvantage in defending himself against anyone who might want to do him harm. As it turns out, the only 'harm' that befell him (luckily) turned out to be the humiliation of being 'pantsed' * * * by a fellow inmate. As if it were not bad enough that [petitioner's] actions left [the inmate] vulnerable to that indignity (and potentially much worse), she compounded this lapse in judgment by taking digital photographs of the

inmate with his pants down. These actions are simply inexcusable from a corrections professional."

The arbitrator, nonetheless, found that the county

"lacked just cause to discharge [petitioner] under these precise circumstances. That is so despite the fact that [petitioner's] actions were thoroughly unprofessional, and despite the fact that she failed to account for the extent to which her position of authority over inmates of the work center could lead her to conclude, mistakenly, that the inmates were willing participants in her 'jokes.' She also failed to appreciate the County's exposure to potential liability because of her actions, even if they were not 'malicious.' These are significant failings in a corrections professional."

According to the arbitrator, in light of petitioner's admission that she had acted inappropriately, the "record does not establish *** that [petitioner] is beyond rehabilitation." Because of all the circumstances—including the fact that Jochums had received only a one-day suspension—the arbitrator held that the appropriate sanction was a 30-day unpaid suspension and ordered petitioner reinstated.

The county initially did not comply with the arbitrator's decision; it refused to reinstate petitioner. For that reason, petitioner's union filed a complaint with the Employment Relations Board (ERB). Ultimately, ERB issued an order in which it concluded that "the law required [it] to enforce the arbitrator's award." Accordingly, it ordered the county to "cease and desist from refusing to comply with the arbitrator's award." Thereafter, petitioner's employment was reinstated.

Meanwhile, after the arbitrator had issued his decision and before ERB issued its order, DPSST sent petitioner a letter advising her that, unless she signed a stipulated order revoking her certifications, her case would be presented to the "Corrections Policy Committee [(policy committee)] who [would] review the underlying investigation and make a recommendation whether to revoke [her] certifications based on [her] conduct." (Emphasis omitted.) Petitioner provided a response for the policy committee's consideration. After meeting to consider petitioner's case, the policy committee

voted that her conduct constituted discretionary disqualifying misconduct under OAR 259-008-0070(4) and that petitioner's certifications should be revoked. DPSST then issued a notice that it intended to revoke petitioner's certifications based on discretionary disqualifying conduct under OAR 259-008-0070(4). Petitioner requested a hearing, which DPSST referred to the Office of Administrative Hearings (OAH).

DPSST moved for summary determination of the legal issues pursuant to OAR 137-003-0580. That rule "provides for an administrative 'summary determination' proceeding that is akin to a trial court summary judgment proceeding under ORCP 47." *Lucke v. DPSST*, 247 Or App 630, 633, 270 P3d 251 (2012). Specifically, under OAR 137-003-0580, an administrative law judge (ALJ) shall grant a motion for summary determination if

"(a) The pleadings, affidavits, supporting documents (including any interrogatories and admissions) and the record in the contested case show that there is no genuine issue as to any material fact that is relevant to the resolution of the legal issue as to which a decision is sought; and

"(b) The agency or party filing the motion is entitled to judgment as a matter of law."

OAR 137-003-0580(6). In considering such a motion, the ALJ must view "all evidence in a manner most favorable to the non-moving party or non-moving agency." OAR 137-003-0580(7).

Petitioner opposed DPSST's motion for summary determination. She asserted that, in light of the arbitrator's decision in the case relating to her employment, DPSST violated OAR 259-008-0070(9) when it referred "the holding cell incident to the Policy Committee and Board for review." (Boldface omitted.) Petitioner also asserted that issues of fact remained regarding whether she was of "good moral fitness." (Boldface omitted.) The matter was assigned to an ALJ from the OAH, who issued a ruling on summary determination and a proposed order concluding that DPSST was entitled to a favorable ruling as a matter of law that petitioner lacked good moral fitness under OAR 259-008-0010(6).

Specifically, the ALJ concluded that petitioner's conduct fell within several categories of discretionary disqualifying misconduct under OAR 259-008-0070(4)(b): disregard for the rights of others, OAR 259-008-0070(4)(b)(B); misuse of authority, OAR 259-008-0070(4)(b)(C); and misconduct, OAR 259-008-0070(4)(b)(E). The ALJ further concluded that, as a sanction for her misconduct, DPSST could revoke petitioner's certifications. Petitioner filed exceptions to the proposed order. However, DPSST rejected those exceptions and adopted the proposed order in its entirety.

On judicial review, petitioner contends that DPSST erred in concluding, on summary determination, that she lacked good moral fitness. Petitioner makes several arguments in support of her contention. On review, we address one of those arguments and reject the remainder without discussion. Specifically, we write to discuss petitioner's contention that DPSST violated OAR 259-008-0070(9) by "referring the holding cell incident to the Policy Committee and Board for review." (Boldface omitted.)

OAR 259-008-0070(9) describes the procedure by which DPSST may revoke a public safety professional's certifications:

"(a) Agency Initiated Review: When the entity utilizing a public safety professional requests that a public safety professional's certification be denied or revoked, it must submit in writing to Standards and Certification the reason for the requested denial or revocation and all factual information supporting the request.

"(b) Standards and Certification Initiated Review: Upon receipt of factual information from any source, and pursuant to ORS 181.662, Standards and Certification may request that the public safety professional's certification be denied or revoked.

"(c) Standards and Certification Staff Review: When Standards and Certification receives information, from any source, that a public safety professional may not meet the established standards for Oregon public safety professionals, Standards and Certification will review the request and the supporting factual information to determine if the request for denial or revocation meets statutory and administrative rule requirements.

"(A) If the reason for the request does not meet the statutory and administrative rule requirements for denial or revocation, Standards and Certification will notify the requestor.

"(B) If the reason for the request does meet statutory and administrative rule requirements but is not supported by adequate factual information, Standards and Certification will request further information from the employer or conduct its own investigation of the matter.

"(C) If Standards and Certification determines that a public safety professional may have engaged in discretionary disqualifying misconduct listed in subsection (4), the case may be presented to the Board, through a Policy Committee.

"(D) Standards and Certification will seek input from the affected public safety professional, allowing him or her to provide, in writing, information for the Policy Committee and Board's review.

"(E) In misconduct cases where there has been an arbitrator's opinion related to the public safety professional's employment, Standards and Certification will proceed as follows:

"(i) If the arbitrator's opinion finds that underlying facts supported the allegations of misconduct, Standards and Certification will proceed as identified in paragraphs (A) through (D) of this subsection.

"(ii) If the arbitrator has ordered reinstatement after a discharge for cause without a finding related to whether the misconduct occurred, Standards and Certification will proceed as identified in paragraphs (A) though (D) of this subsection.

"(iii) If the arbitrator's opinion finds that underlying facts did not support the allegation(s) of misconduct, Standards and Certification will proceed as identified in paragraph (A) of this subsection and administratively close the matter."

Here, as noted, there was an arbitrator's opinion related to petitioner's employment. Petitioner asserts that, by referring the holding cell incident to the policy committee along with the handcuffing incident, DPSST violated OAR 259-008-0070(9)(c)(E)(iii). According to petitioner, the

"arbitrator specifically found that the holding cell incident was not 'misconduct' and ordered Marion County to withdraw all disciplinary action for that incident." Thus, in her view, under the rule, "DPSST should have administratively closed at least that part of [the] matter and not presented that information to the ALJ." DPSST responds that, "[c]ontrary to petitioner's assertion, the arbitrator did not find that petitioner's conduct in the holding cell incident was *not* misconduct." (Emphasis in original.) Instead, DPSST asserts, the arbitrator concluded only that her conduct in that incident did not violate the section of the code of conduct asserted by the county. DPSST points out that the arbitrator specifically stated that petitioner "clearly acted unprofessionally" and inappropriately and that he "h[e]ld merely that the proof in the record does not support the County's burden to establish a violation of the specific rule relied upon in imposing the suspension." Thus, in its view, "petitioner's reliance on OAR 259-008-0070(9)(c)(E)(iii) is misplaced." We agree with DPSST.

Resolution of the parties' arguments turns on a proper understanding of the rule. "Generally speaking, we interpret rules by applying the same analytical framework that applies to the interpretation of statutes." *Brand Energy Services, LLC v. OR-OSHA*, 261 Or App 210, 214, 323 P3d 356 (2014). Specifically, we look to the text of the rule, in the context of other portions of the rule and related laws. *State v. Teixeira*, 259 Or App 184, 190, 313 P3d 351 (2013). We may also look to the rule's history, including the rule's adoption record, to the extent that it is helpful. *See State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009); *see also Brand Energy Services, LLC*, 261 Or App at 214 (we may consider a rule's adoption history); *Thomas Creek Lumber v. Board of Forestry*, 188 Or App 10, 22, 69 P3d 1238 (2003) ("In construing an administrative rule, we apply the same analytical framework applicable to the construction of statutes ***.").[4]

---

[4] We note that the parties do not offer any history for the rule in question. We further observe that, in their briefs, the parties do not appear to acknowledge that resolution of their conflicting contentions requires us to interpret the rule. Nonetheless, "[w]e have an independent obligation under the law to discern the correct interpretation of an administrative rule, regardless of the arguments of the parties." *Tye v. McFetridge*, 199 Or App 529, 532 n 2, 112 P3d 435 (2005), *aff'd*, 342 Or 61, 149 P3d 1111 (2006).

Again, under OAR 259-008-0070(9)(c)(E)(i), in misconduct cases where there has been an arbitrator's opinion related to a public safety professional's employment, "[i]f the arbitrator's opinion finds that underlying facts supported the allegations of misconduct," then DPSST is to proceed through the process set forth in OAR 259-008-0070(9)(c)(A) to (D). However, under OAR 259-008-0070(9)(c)(E)(iii), "[i]f the arbitrator's opinion finds that the underlying facts did not support the allegation(s) of misconduct," DPSST is to notify the entity requesting revocation of the public safety professional's certification and "administratively close the matter." The issue here is whether the arbitrator's determination regarding the holding cell incident is a finding that the "underlying facts did not support the allegation(s) of misconduct" under OAR 259-008-0070(9)(c)(E)(iii). Thus, we must determine the meaning of the term "allegation(s) of misconduct" as used in the rule.

The term "misconduct" is used throughout the rule, and we understand the rule to use the term consistently. *See Pete's Mountain Homeowners v. Ore. Water Resources*, 236 Or App 507, 518, 238 P3d 395 (2010) ("It is a longstanding principle of statutory construction that words may be assumed to be used consistently throughout a statute."). As noted, under the rules, officers are to be of good moral fitness and, under OAR 259-008-0010(6), an officer lacks good moral fitness if he or she engages in either "[m]andatory disqualifying misconduct" under OAR 259-008-0070(3) or "[d]iscretionary disqualifying misconduct" under OAR 259-008-0070(4). Those sections of OAR 259-008-0070, in turn, list conduct by an officer that will be either mandatory grounds for revoking certification or, in the case of OAR 259-008-0070(4), "[d]iscretionary disqualifying misconduct" that may constitute grounds for revoking a public safety professional's certification.

OAR 259-008-0070(9)(c)(E), by its terms, applies to "misconduct cases"—that is, it applies in cases where an officer is alleged to have engaged in misconduct, as set forth within earlier sections of the rule. In such cases, where there has also been an arbitrator's opinion relating to the officer's employment, if the arbitrator's opinion finds that the underlying facts of the case do not support "the allegation(s) of

misconduct," then the case must be administratively closed. That is, if the arbitrator's opinion in the employment case has addressed the allegation or allegations of misconduct that are made under OAR 259-008-0070, then that decision resolves the issue in the certification case before DPSST. We interpret "the allegation(s) of misconduct" in OAR 259-008-0070(9)(c)(E) to refer to the allegations in the "misconduct case[]" that is being presented to the board.

Here, of course, petitioner's case is such a "misconduct" case. DPSST proposed to revoke petitioner's certification as a result of "[d]iscretionary disqualifying misconduct" under OAR 259-008-0070(4). It is also a case where there was an arbitrator's decision relating to petitioner's employment. However, the arbitrator's decision does not address the allegations of misconduct at issue in the DPSST case under OAR 259-008-0070(4). In this case, DPSST asserted that petitioner's conduct fell within four categories of discretionary disqualifying misconduct under the rule: "Category II: Disregard for the Rights of Others;" "Category III: Misuse of Authority;" "Category IV: Gross Misconduct;" and "Category V: Misconduct." The arbitrator's decision in the employment case found that petitioner engaged in the conduct alleged (the handcuffing incident and the holding cell incident) but concluded that the holding cell incident was not a violation of the specific code of conduct section relied on by the county, which required "that all persons be treated with respect and courtesy." (Internal quotation marks omitted.) That conclusion does not address whether petitioner's conduct meets all of the categories of discretionary disqualifying misconduct alleged by DPSST. Indeed, the arbitrator specifically noted the limited nature of his conclusion with respect to the holding cell incident, noting that it should not be understood to state that petitioner's behavior in the holding cell incident was appropriate. "On the contrary," according to the arbitrator, petitioner "clearly acted unprofessionally." Furthermore, the arbitrator noted that petitioner's conduct may well have been prohibited by other rules, and he held "merely that the proof in the record does not meet the County's burden to establish a violation of the specific rule relied upon in imposing the suspension." That conclusion is not a finding that the facts do not support the allegations of misconduct made in

this case under OAR 259-008-0070(4). Indeed, to the extent that the arbitrator noted that petitioner's conduct in the holding cell incident was unprofessional and inappropriate, his decision could be understood to support the allegations of misconduct at issue in this case. Accordingly, we reject petitioner's assertion that, in light of the arbitrator's decision, DPSST violated OAR 259-008-0070(9)(c)(E)(iii) when it included the holding cell incident as one of the factual bases for its allegations of discretionary disqualifying misconduct in the certification case.

In light of the foregoing, we conclude that DPSST did not err in revoking petitioner's corrections certifications.

Affirmed.